# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## SOUTHEASTERN DIVISION

| | | |
|---|---|---|
| LAVONDA S. BURCHARD, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 1:08CV 87 CAS(LMB) |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## REPORT AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

This is an action under 42 U.S.C. § 405(g) for judicial review of defendant's final decision denying the application of Lavonda S. Burchard for Supplemental Security Income under Title XVI of the Social Security Act. The cause was referred to the undersigned United States Magistrate Judge for a Report and Recommendation pursuant to 28 U.S.C. § 636 (b). Plaintiff has filed a Brief in Support of the Complaint. (Document Number 20). Defendant has filed a Brief in Support of the Answer. (Doc. No. 23).

## Procedural History

On January 13, 2006, plaintiff filed her application for benefits, claiming that she became unable to work due to her disabling condition on October 10, 1998. (Tr. 77-81). This claim was denied initially, and following an administrative hearing, plaintiff's claim was denied in a written opinion by an Administrative Law Judge (ALJ), dated July 23, 2007. (Tr. 49, 9-23). Plaintiff then filed a request for review of the ALJ's decision with the Appeals Council of the Social

Security Administration (SSA), which was denied on May 6, 2008.  (Tr. 8, 4-7).  Thus, the decision of the ALJ stands as the final decision of the Commissioner.  See 20 C.F.R. §§ 404.981, 416.1481.

## Evidence Before the ALJ

### A.    ALJ Hearing

Plaintiff's administrative hearing was held on April 4, 2007.  (Tr. 26).  Plaintiff was present and was represented by counsel.  (Tr. 28).  The ALJ began the hearing by admitting the exhibits into evidence.  (Id.).

The ALJ then examined plaintiff, who testified that she lived in a home with her husband and her seven-year-old daughter.  (Tr. 29).  Plaintiff stated that neither her husband nor her daughter receive Social Security disability benefits.  (Id.).

Plaintiff testified that she completed the tenth grade.  (Tr. 30).  Plaintiff stated that she has not received any vocational or computer training.  (Id.).  Plaintiff testified that she has not done any baby-sitting, although she took care of her dying father-in-law in 1997.  (Id.).

Plaintiff stated that she has not been in prison or jail.  (Id.).  Plaintiff testified that she has never had any DUIs or DWIs.  (Id.).  Plaintiff stated that she has never been through detox or rehab or been hospitalized for alcohol or drugs.  (Id.).  Plaintiff testified that she was arrested twice for possession of marijuana.  (Tr. 31).  Plaintiff stated that she was last arrested in 2001 for fraud.  (Id.).  Plaintiff explained that her Social Security number "came back fraudulent."  (Id.).

Plaintiff testified that she underwent a psychiatric evaluation at the request of her attorney in March of 2007.  (Id.).  Plaintiff stated that she was honest with the examiner.  (Id.).  Plaintiff testified that she reported to the examiner that she had not used cannabis or acid since she was

thirteen. (Tr. 32). Plaintiff acknowledged that this statement was not truthful. (Id.). Plaintiff testified that she was dishonest with the examiner because she did not believe that this information was "any of his business." (Id.). Plaintiff stated that the examiner's questions were "too personal." (Id.). The ALJ stated that, because plaintiff was not honest with the psychiatric evaluator, the evaluation is unreliable. (Id.). The ALJ noted that plaintiff tested positive for marijuana on an October 2006 drug screen. (Id.). The ALJ also stated that plaintiff reported that she drank a fifth of rum on New Year's Eve. (Id.).

Plaintiff testified that she was honest with other psychiatric examiners. (Tr. 33). Plaintiff stated that she was as honest with other psychiatric examiners as she was with Dr. John Wood. (Tr. 33). The ALJ pointed out that plaintiff lied to Dr. Wood. (Id.).

Plaintiff's attorney examined plaintiff, who testified that she was treating with Dr. Naveed Mirza for bipolar disorder, posttraumatic stress disorder, and mood outrages. (Id.). Plaintiff stated that Dr. Mirza is trying to help her with severe depression she is experiencing. (Tr. 34). Plaintiff testified that she struggles to get out of bed each day due to the depression. (Id.). Plaintiff stated that she is unable to get out of bed because she feels as though the world is closing in. (Id.).

The ALJ asked plaintiff how drugs and alcohol affect her mental impairments. (Id.). Plaintiff testified that she had not used any drugs or alcohol since she was tested last. (Id.). The ALJ noted that plaintiff reported to Dr. Wood that she was drinking over New Year's in 2007. (Id.). Plaintiff testified that she drank on New Year's because it was a special occasion. (Id.).

Plaintiff's attorney resumed questioning plaintiff, who testified that she also experiences severe headaches as a result of the depression. (Tr. 35). Plaintiff stated that she struggles to get

up and see her daughter off to school in the morning. (Id.).

Plaintiff testified that she also has nightmares. (Id.). Plaintiff stated that she gets up during the night to check the doors to make sure she is safe. (Id.). Plaintiff testified that she has nightmares that her deceased ex-husband is going to kill her every night. (Id.). Plaintiff stated that when she has these nightmares, she sweats, she jumps up, and feels like she needs to load a gun or commit suicide. (Id.). Plaintiff testified that she checks the doors to make sure that her family is safe about two times a night. (Tr. 36). Plaintiff stated that she does not sleep well. (Id.).

Plaintiff testified that her depression prevents her from engaging in activities she once enjoyed, such as fishing and gardening. (Id.). Plaintiff stated that she occasionally feels as though it would be easy to take an overdose of pills rather than go on with her life. (Id.). Plaintiff testified that she has been hospitalized due to these feelings. (Id.).

Plaintiff stated that she tried to commit suicide on one occasion by taking pills. (Tr. 37). Plaintiff testified that she was hospitalized due to this incident. (Id.). Plaintiff stated that she has continued to see her doctor, Dr. Mirza, and a counselor, Roxanne Wiggs, since her release. (Id.). Plaintiff testified that she is scheduled to start seeing Ms. Wiggs once a week. (Id.).

Plaintiff stated that she tries to harm herself. (Tr. 38). Plaintiff testified that she also goes into rages in which she wants to destroy property. (Id.).

Plaintiff stated that her depression affects her ability to get along with people. (Id.). Plaintiff testified that she does not like to be told what to do. (Id.). Plaintiff stated that if people look at her the wrong way or say the wrong thing, she does not take it well. (Id.). Plaintiff testified that she prepares to fight people when she feels this way. (Id.). Plaintiff stated that she

does not like to fight because she is unable to stop once she starts. (Id.). Plaintiff testified that she fears that she could kill someone by beating them to death. (Id.).

Plaintiff stated that it is difficult for her to get out and go places. (Id.). Plaintiff testified that she does not like to go out in public because she feels safer at home. (Id.).

The ALJ then noted that plaintiff testified that she did not tell Dr. Wood the truth during her evaluation because he was asking her personal questions and that plaintiff's attorney was asking plaintiff personal questions at the hearing. (Tr. 39). The ALJ asked plaintiff whether she was testifying truthfully at the hearing. (Id.). Plaintiff testified that she was telling the truth at the hearing and that she had no reason to lie. (Id.).

The ALJ asked plaintiff's attorney whether plaintiff had any physical impairments. (Id.). Plaintiff's attorney stated that plaintiff had lower back pain, leg pain, and a fractured left wrist. (Tr. 40). Plaintiff's attorney stated that plaintiff has been diagnosed with a disc protrusion at L5 with mass effect on the exiting L5 nerve root on the left. (Id.). Plaintiff testified that Dr. Andy Gale will not recommend surgery but he prescribes Darvocet[1] for this impairment. (Id.). Plaintiff's attorney stated that plaintiff was diagnosed with anemia, which resolved, and she underwent a hysterectomy in September 2005. (Id.). Plaintiff's attorney stated that plaintiff's primary physical impairment was her low back problem. (Tr. 41).

Plaintiff's attorney then resumed questioning plaintiff, who testified that during a typical day, she tries to wash dishes, and does a little light dusting and sweeping. (Id.). Plaintiff stated that her medical conditions affect how she performs housework. (Id.). Plaintiff testified that she

---

[1]Darvocet is indicated for the relief of mild to moderate pain. See Physician's Desk Reference (PDR), 402 (59th Ed. 2005).

is unable to reach into the cabinets and put away dishes due to her back problem and tendonitis[2] in her left shoulder. (Id.). Plaintiff stated that she experiences difficulty folding laundry due to back pain and pain in her arm and wrists. (Tr. 42). Plaintiff testified that she is only able to dust or sweep if her back and wrist are not bothering her and if she does not have a headache. (Id.).

Plaintiff stated that if she is not performing household chores, she stares at the walls. (Id.). Plaintiff testified that she used to enjoy gardening and fishing but they are affected by her impairments. (Id.). Plaintiff stated that she fishes a little. (Tr. 43). Plaintiff testified that she is unable to fish but she goes fishing to relax and help with her depression. (Id.). Plaintiff stated that she is unable to bend and stoop to garden. (Id.). Plaintiff testified that she is not involved in any social activities or church activities. (Id.).

The ALJ then questioned plaintiff, who testified that, although she told Dr. Wood that she socialized with her family and friends, she only socializes when she wants to socialize. (Id.). Plaintiff stated that she ends up fighting when she socializes with people. (Tr. 44). Plaintiff testified that her friends have not wanted to associate with her since she stopped doing drugs. (Id.). Plaintiff stated that when she did drugs, she did acid and smoked marijuana. (Id.). Plaintiff testified that she quit taking pills right after she was tested by Dr. Mirza and she has not done acid. (Id.). The ALJ noted that plaintiff's testimony was inconsistent. (Id.).

Plaintiff testified that she is able to stand about five minutes before she has to sit down and prop her legs. (Id.). Plaintiff stated that she is able to sit for two to three hours. (Id.). Plaintiff testified that she is able to walk to her mailbox, which is about 500 yards from her house. (Tr. 45). Plaintiff stated that she can lift about five pounds. (Id.). Plaintiff testified that she is able to

---

[2]Inflammation of a tendon. Stedman's Medical Dictionary, 1945 (28th Ed. 2006).

lift a gallon of milk but she is not able to lift a ten-pound bag of potatoes. (Id.).

Plaintiff stated that she attends her daughter's t-ball games. (Id.). Plaintiff testified that she also attends parent-teacher conferences. (Id.). Plaintiff stated that she does not attend church. (Id.).

Plaintiff testified that she has a pet Chihuahua. (Id.).

Plaintiff stated that her doctor has not given her physical therapy exercises to perform for her back. (Id.). Plaintiff testified that her doctor just tells her that if her back acts up, she should lie down, place a heating pad underneath her back, and keep her head and feet above her chest and heart. (Tr. 46).

Plaintiff stated that she cooks for the household. (Id.). Plaintiff testified that she is able to groom and bathe herself. (Id.).


**B.**     **Relevant Medical Records**

The record reveals that plaintiff underwent an MRI of the left shoulder on September 17, 2004, which revealed mild degenerative changes. (Tr. 151).

Plaintiff underwent an MRI of the lumbar spine on February 11, 2005, which revealed left foraminal disc protrusion that narrows the left foramen and exhibits mass effect upon the exiting left L5 nerve root and mild lower lumbar facet osteoarthropathy.[3] (Tr. 150).

Plaintiff presented to Wayne Medical Center for various complaints, including bronchitis, asthma, panic attacks, depression, low back pain, and cold and flu symptoms from January 2005 through February 2007. (Tr. 165-226, 249-263, 336-372). Plaintiff was treated with medication.

---

[3]A disorder affecting bones and joints. Stedman's at 1388.

(Id.).

Marsha J. Toll, Psy.D. completed a Psychiatric Review Technique on April 12, 2006. (Tr. 235-48). Dr. Toll expressed the opinion that plaintiff had no medically determinable impairment. (Tr. 235).

Plaintiff presented to Roxanne Wiggs, LCSW at the Kneibert Clinic on July 14, 2006. (Tr. 333). Plaintiff reported severe depression since a very young age. (Id.). Plaintiff indicated that she had last been treated for depression when she was sixteen, at which time she attempted suicide. (Id.). Plaintiff stated that she had been sexually abused from the age of two to four and she had been physically abused by her prior husband. (Id.). Plaintiff reported problems with low self-esteem, trust issues, nightmares, flashbacks, severe depression, and occasional thoughts of suicide. (Id.). Ms. Wiggs recommended that plaintiff continue therapy. (Id.).

Plaintiff presented to Ms. Wiggs for therapy on July 21, 2006. (Tr. 332). Ms. Wiggs found plaintiff's condition had not changed since her last visit. (Id.). Ms. Wiggs stated that plaintiff needed to work on her social skills. (Id.). Plaintiff reported that she had no activities other than cleaning the house and that she needed help caring for herself. (Id.). Plaintiff reported difficulty learning and indicated that she was in special classes throughout school and had been told that she was mentally retarded. (Id.). Plaintiff complained of severe nightmares due to her abuse. (Id.). Ms. Wiggs found plaintiff's mood to be depressed, with her insight and judgment fair. (Tr. 331). She diagnosed plaintiff with history of bipolar disorder,[4] mixed, moderate; PTSD; and learning disability. (Id.).

On August 4, 2006, plaintiff reported that her depression still was not good. (Tr. 330).

_____

[4]An affective disorder characterized by the occurrence of alternating manic, hypomanic, or mixed episodes and with major depressive episodes. Stedman's at 568.

Plaintiff complained of continued flashbacks of her abuse. (Id.). Ms. Wiggs described plaintiff's affect as tearful. (Id.). She referred plaintiff to a psychiatrist for further evaluation and medications. (Id.).

Plaintiff presented to Ms. Wiggs on August 25, 2006, at which time she described the abuse she had suffered by her ex-husband. (Tr. 328). Plaintiff reported that she was not sleeping, did not want to socialize with others, and had flashbacks. (Id.). Plaintiff also indicated that she did not trust any man at all. (Id.). Ms. Wiggs described plaintiff's affect as tearful. (Tr. 329).

On September 8, 2006, plaintiff reported that she had had the hardest week in her life. (Tr. 326). Plaintiff indicated that she had been in bed all week, and was having problems with her husband. (Id.). Plaintiff reported being very angry and irritable most of the time. (Id.).

On September 29, 2006, plaintiff reported that she had tried to overdose the previous night by taking a handful of pills. (Tr. 324). Plaintiff stated that she had had a nervous breakdown because her husband told her to leave and that he wanted to raise their child by himself. (Id.). Plaintiff stated that the world was better off without her and that she wanted to die. (Id.). Ms. Wiggs referred plaintiff to the hospital for an evaluation and to be admitted. (Id.).

Plaintiff presented to the emergency room at Poplar Bluff Regional Medical Center on September 29, 2006, with complaints of severe depression. (Tr. 265). Plaintiff was diagnosed with depression and possible bipolar disorder and was admitted for psychiatric care and management. (Tr. 266). Plaintiff reported a long history of depression dating back to childhood. (Tr. 267). Plaintiff also alleged childhood physical and sexual abuse from the ages of two to four as well as severe physical abuse by her previous husband. (Id.). Plaintiff's medications were listed as Klonopin,[5]

---

[5]Klonopin is indicated for the treatment of panic disorder. See PDR at 2895.

Hydrochlorothiazide,[6] Zoloft,[7] Trazodone,[8] and Darvocet. (Tr. 268). Plaintiff reported past use of methamphetamine and marijuana, as well as "anything I could get my hands on," but denied any substance use since 1990. (Tr. 268). Plaintiff reported drinking the prior weekend but denied alcohol use since New Year's and prior to that. (Id.). A mental status examination revealed that plaintiff was somewhat anxious, cooperative, nervous, with logical thought processes and no delusions, paranoia, or suicidal ideations. (Tr. 268-69). Plaintiff appeared to be of average intellect, with fair insight and judgment. (Tr. 269). The assessment of John Wilkaitis, M.D. was post-traumatic stress disorder ("PTSD"),[9] major depressive disorder,[10] and rule out underlying bipolar disorder. (Tr. 269). Dr. Wilkaitis assessed a GAF[11] of 55.[12] (Id.). Plaintiff was discharged against medical advice on

[6]Hydrochlorothiazide is indicated for the treatment of hypertension. See PDR at 613.

[7]Zoloft is indicated for the treatment of major depressive disorder, obsessive-compulsive disorder, panic disorder, and posttraumatic stress disorder. See PDR at 2682-83.

[8]Trazodone is an antidepressant indicated for the treatment of depression. See PDR at 3296.

[9]Development of characteristic long-term symptoms following a psychologically traumatic event that is generally outside the range of usual human experience; symptoms include persistently re-experiencing the event and attempting to avoid stimuli reminiscent of the trauma, numbed responsiveness to environmental stimuli, a variety of autonomic and cognitive dysfunctions, and dysphoria. Stedman's at 570.

[10]A mental disorder characterized by sustained depression of mood, anhedonia, sleep and appetite disturbances, and feelings of worthlessness, guilt, and hopelessness. Stedman's at 515.

[11]The Global Assessment of Functioning Scale (GAF) is a psychological assessment tool wherein an examiner is to "[c]onsider psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness" which does "not include impairment in functioning due to physical (or environmental) limitations." Diagnostic and Statistical Manual of Mental Disorders (DSM-IV), 32 (4th Ed. 1994).

[12]A GAF score of 51-60 denotes "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." DSM-IV at 32.

September 30, 2006.  (Id.).

Plaintiff presented to Ms. Wiggs on October 9, 2006.  (Tr. 321).  Plaintiff reported experiencing continuing nightmares about her dead husband.  (Id.).  Plaintiff indicated that her relationship with her current husband was getting better.  (Id.).  Plaintiff reported that she had become very withdrawn.  (Id.).  Plaintiff indicated that she was not suicidal at the time, although the thought was always there.  (Id.).

Plaintiff presented to Naveed J. Mirza, M.D. on October 13, 2006, for a psychiatric evaluation.  (Tr. 306-320).  Plaintiff reported a constant feeling of hopelessness, worthlessness, anhedonia, tearfulness, difficulty sleeping, suicidal thoughts, mood swings, panic attacks, periods of increased energy, flashbacks, nightmares, and checking behavior.  (Tr. 306).  Dr. Mirza described plaintiff's affect as sad, tearful, and anxious.  (Tr. 309).  Plaintiff's mood was described as depressed, angry, irritable, and anxious.  (Id.).  Plaintiff had low self-esteem and appeared demoralized and guilty.  (Id.).  Plaintiff's insight was described as poor and her judgment was described as fair.  (Id.).  Dr. Mirza's assessment was bipolar disorder II,[13] PTSD, panic disorder,[14] rule out obsessive-compulsive disorder ("OCD"),[15] and rule out borderline personality disorder.[16]  (Tr. 310).  He

---

[13]An affective disorder characterized by the occurrence of alternating hypomanic and major depressive episodes.  Stedman's at 568.

[14]Recurrent panic attacks that occur unpredictably.  Stedman's at 570.

[15]A type of anxiety disorder the essential features of which include recurrent obsessions, persistent intrusive ideas, thoughts, impulses or images, or compulsions sufficiently severe to cause marked distress, be time-consuming, or significantly interfere with the person's normal routine, occupational functioning, or usual social activities or relationships with others.  Stedman's at 570.

[16]An enduring and pervasive pattern that begins by early adulthood and is characterized by impulsivity and unpredictability, unstable interpersonal relationships, inappropriate or uncontrolled

assessed a GAF of 50.[17] (Id.). Dr. Mirza started plaintiff on Lamictal[18] and continued her other medications. (Id.). Dr. Mirza also ordered a lab work-up, which was positive for marijuana. (Tr. 312).

Plaintiff presented to Dr. Mirza on October 16, 2006, for medication management, at which time she reported feeling better, although she continued to feel depressed and to have panic attack symptoms. (Tr. 303). Dr. Mirza described plaintiff's mood as anxious. (Tr. 304). Dr. Mirza started plaintiff on Lamictal, increased her Zoloft, and continued her Klonopin and Trazodone. (Tr. 305).

Plaintiff presented to Ms. Wiggs on October 19, 2006, at which time she indicated that she continued to have marital issues along with the stress of her mental health condition. (Tr. 301). Plaintiff reported continued flashbacks of her past abuse. (Id.). Plaintiff indicated that she was compliant with her medications. (Id.).

Plaintiff underwent an MRI of the left knee on October 27, 2006, which revealed mild osteoarthritis.[19] (Tr. 270).

Plaintiff presented to Dr. Mirza on November 3, 2006, at which time plaintiff reported that

---

affect, especially anger, identity disturbances, rapid shifts of mood, suicidal acts, self-mutilations, job and marital instability, chronic feelings of emptiness or boredom, and intolerance of being alone. Stedman's at 568.

[17]A GAF score of 41 to 50 indicates "serious symptoms" or "any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." DSM-IV at 32.

[18]Lamictal is indicated for the treatment of bipolar disorder. See PDR at 1533.

[19]Arthritis characterized by erosion of articular cartilage, either primary or secondary to trauma or other conditions, which becomes soft, frayed, and thinned with eburnation of subchondral bone and outgrowths of marginal osteophytes; pain and loss off unction result. See Stedman's at 1388.

she had not seen any change with the medications.  (Tr. 298).  Plaintiff continued to feel depressed, tired, exhausted, and did not want to face the world.  (Id.).  Plaintiff also reported having mood swings and being irritable, although her panic attacks were less in frequency.  (Id.).  Dr. Mirza started plaintiff on Abilify[20] and continued her other medications.  (Tr. 299).

On November 17, 2006, plaintiff reported improvement in her mood, less tearfulness, less depression, and less irritability.  (Tr. 295).  Plaintiff indicated that she continued to have sleep problems.  (Id.).  Dr. Mirza increased plaintiff's Abilify and started her on Lunesta.[21]  (Tr. 297).

Plaintiff presented to Ms. Wiggs on December 1, 2006.  (Tr. 292).  Plaintiff reported that she was planning on going to a party, and denied any suicidal thoughts.  (Id.).  Plaintiff reported that she was very untrusting towards men and that she was considering moving out of her house.  (Id.).  Ms. Wiggs stated that plaintiff was exhibiting some bizarre thoughts about her relationships and that she feared her husband being abusive.  (Id.).  Plaintiff continued to have severe flashbacks of the abuse.  (Id.).

Plaintiff presented to Dr. Mirza on January 5, 2007, at which time plaintiff reported that she continued to be moody, had occasional suicidal thoughts, and had difficulty being around people.  (Tr. 288).  Dr. Mirza increased plaintiff's Lamictal and continued her other medications.  (Tr. 290).

On February 9, 2007, plaintiff reported that she had not been sleeping at night, she continued to have nightmares, she had increasing mood swings and she had increasing panic attack symptoms.  (Tr. 284).  Dr. Mirza listed borderline personality disorder as a "new problem."  (Tr. 285).  Dr. Mirza

---

[20]Abilify is a psychotropic drug indicated for the treatment of schizophrenia.  See PDR at 1026-27.

[21]Lunesta is indicated for the treatment of insomnia.  See PDR at 2995.

increased plaintiff's Lamictal and continued her psychotropic medications. (Tr. 286).

On March 9, 2007, plaintiff reported being more irritable the past month. (Tr. 374). Plaintiff also complained of racing thoughts, flashbacks, thoughts of hurting herself, depression, panic attacks, and difficulty concentrating. (Id.). Dr. Mirza increased plaintiff's Klonopin and Abilify and continued her other medications. (Tr. 376).

Plaintiff presented to John O. Wood, Psy.D. for a psychological evaluation on March 13, 2007 and March 14, 2007. (Tr. 378-83). A mental status exam revealed that plaintiff had no difficulty with immediate recall tasks, recalled two of the three words on the delayed recall task, was unable to complete serial sevens and did not spell the word "world" backwards correctly. (Tr. 381). No problems were noted on the language portion of the exam. (Id.). No delusions, hallucinations, or suicidal or homicidal thoughts were present. (Id.). Dr. Wood noted that plaintiff appeared to be of marginal intellectual ability. (Id.). Dr. Wood administered the Wechsler Adult Intelligence Scale (WAIS-III), which resulted in a verbal IQ of 68, a performance IQ of 72, and a full scale IQ score of 67.[22] (Id.). Dr. Wood stated that plaintiff's performance IQ score falls within the borderline range of intellectual efficiency whereas her verbal and full scale IQ scores fall within the mild range of mental retardation. (Id.). Dr. Wood also found that plaintiff's working memory and processing speed index fell within the low average range. (Tr. 382). Dr. Wood diagnosed plaintiff with bipolar affective disorder, mixed, moderate degree (by history); PTSD; learning disability; panic disorder; and limited intellectual ability. (Id.). He assessed a GAF of 55. (Id.). Dr. Wood recommended that plaintiff continue to obtain psychiatric treatment and indicated that plaintiff would likely need

---

[22]Borderline Intellectual Functioning is defined by an IQ score that is higher than that for Mental Retardation, generally 71-84. Mental Retardation is defined by an IQ score of 70 and below. See DSM IV at 45.

outpatient monitoring for the indefinite future.  (Id.).  Dr. Wood stated that plaintiff should also continue to obtain supportive psychotherapy to assist her in learning how to modulate her emotions, to think things through and to develop a more assertive and balanced stance towards her life circumstances.  (Tr. 382-83).  Dr. Wood expressed the opinion that plaintiff would not be capable of managing her financial affairs independently and would need assistance.  (Tr. 383).

Roxanne Wiggs completed a Therapist's Statement of Claimant's Condition on March 30, 2007.  (Tr. 385-92).  Ms. Wiggs listed plaintiff's diagnoses as: bi-polar disorder, mixed, moderate degree; panic disorder; PTSD; borderline personality disorder; learning disorder; and rule out OCD; with a GAF of 45.  (Tr. 385).  Ms. Wiggs identified plaintiff's symptoms as: poor memory, sleep disturbance, personality change, mood disturbance, feelings of guilt/worthlessness, difficulty thinking or concentrating, grossly disorganized behavior, inappropriate affect, manic syndrome, persistent irrational fears, generalized persistent anxiety, and hostility and irritability.  (Id.).  Ms. Wiggs found that plaintiff had mild limitations in her ability to maintain her personal appearance.  (Tr. 391).  Ms. Wiggs expressed the opinion that plaintiff had serious limitations in her ability to follow work rules; relate to co-workers; deal with the public; interact with supervisors; maintain attention/concentration; understand, remember and carry out detailed, but not complex, job instructions; understand, remember and carry out simple job instructions; and behave in an emotionally stable manner.  (Tr. 389-91).  Ms. Wiggs found that plaintiff was unable to perform the following skills at all on a sustained basis: use judgment; deal with work stressors; function independently; understand, remember and carry out complex job instructions; relate predictably in social situations; and demonstrate reliability.  (Id.).  Ms. Wiggs expressed the opinion that plaintiff had marked limitations in her activities of daily living; ability to maintain social functioning; concentration, persistence or

pace resulting in failure to complete tasks in a timely manner; and episodes of deterioration or decompensation in work setting. (Tr. 391). Ms. Wiggs found that plaintiff was able to manage benefits in her own best interests. (Tr. 392).

Dr. Mirza completed a Medical Source Statement on April 2, 2007. (Tr. 394-98). Dr. Mirza listed plaintiff's diagnoses as bipolar affective disorder, PTSD, panic disorder, and borderline personality disorder, with a GAF of 50. (Tr. 394). Dr. Mirza identified plaintiff's symptoms as sleep disturbance, mood disturbance, emotional liability, recurrent panic attacks, anhedonia, psychomotor agitation, paranoia, feelings of guilt/worthlessness, difficulty thinking or concentrating, suicidal ideation or attempts, perceptual disturbances, time or place disorientation, grossly disorganized behavior, social withdrawal or isolation, illogical thinking or loosening of associations, decreased energy, manic syndrome, obsessions or compulsions, intrusive recollections of traumatic experience, persistent irrational fears, generalized persistent anxiety, somatization unexplained by organic disturbance, and hostility and irritability. (Id.). Dr. Mirza stated that plaintiff continues to have mood swings, irritability, and persistent panic attack symptoms. (Tr. 395). He stated that plaintiff was seen in March 2007 for medication management, at which time she continued to have depressed mood, empty feelings, anhedonia, and suicidal ideation with no plan. (Id.). Dr. Mirza indicated that plaintiff was taking an anti-depressant (Zoloft), anti-psychotic (Abilify), mood stabilizer (Lamictal), anti-anxiety medication (Clonopin), and insomnia medication (Lunesta). Dr. Mirza stated that plaintiff's impairments would cause her to be absent from work an average of more than three times a month. (Tr. 396). Dr. Mirza found that plaintiff had mild limitations in her ability to maintain her personal appearance, relate predictably in social situations, and demonstrate reliability. (Tr. 397). Dr. Mirza expressed the opinion that plaintiff had serious limitations in her ability to follow work rules; relate

- 16 -

to co-workers; use judgment; interact with supervisors; deal with work stressors; understand, remember, and carry out complex job instructions; understand, remember, and carry out detailed, but not complex, job instructions; understand, remember, and carry out simple job instructions; and behave in an emotionally stable manner. (Tr. 396-97). Dr. Mirza found that plaintiff was unable to perform the following skills at all on a sustained basis: deal with the public, function independently, and maintain attention/concentration. (Id.). Dr. Mirza expressed the opinion that plaintiff had moderate limitations in her activities of daily living; and marked limitations in her ability to maintain social functioning; deficiencies of concentration, persistence or pace resulting in failure to complete tasks in a timely manner; and episodes of deterioration or decompensation in a work setting. (Tr. 398). Dr. Mirza found that plaintiff was able to manage benefits in her own best interests. (Id.).

**The ALJ's Determination**

The ALJ made the following findings:

1.    The claimant has not engaged in substantial gainful activity since January 13, 2006, the application date (20 CFR 416.920(b) and 416.971 *et seq*.).

2.    The claimant has the following severe impairments: degenerative disc disease of the lumbar spine, degenerative joint disease, asthma, bipolar affective disorder, posttraumatic stress disorder, a panic disorder, and a borderline personality disorder (20 CFR 416.920(c)).

3.    The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926)

4.    After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work, except understanding, remembering and carrying out complex or detailed instructions or to make work-related decisions involving similar skilled or semi-skilled tasks.

5.    The claimant has no past relevant work (20 CFR 416.965).

6.      The claimant was born on June 26, 1996 and was thirty-nine years old, which is defined as a younger individual age 18-49, on the date the application was filed (20 CFR 416.963).

7.      The claimant has a limited education and is able to communicate in English (20 CFR 416.964).

8.      Transferability of job skills is not an issue because the claimant does not have past relevant work (20 CFR 416.968).

9.      Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.960(c) and 416.966).

10.     The claimant has not been under a disability, as defined in the Social Security Act, since January 13, 2006, the date the application was filed (20 CFR 416.920(g)).

(Tr. 14-23).

The ALJ's final decision reads as follows:

Based on the application for supplemental security income filed on January 13, 2006, the claimant is not disabled under section 1614(a)(3)(A) of the Social Security Act.

(Tr. 23).

## Discussion

### A.      Standard of Review

Judicial review of a decision to deny Social Security benefits is limited and deferential to the agency. See Ostronski v. Chater, 94 F.3d 413, 416 (8th Cir. 1996). The decision of the SSA will be affirmed if substantial evidence in the record as a whole supports it. See Roberts v. Apfel, 222 F.3d 466, 468 (8th Cir. 2000). Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a conclusion. See Kelley v. Callahan, 133 F.3d 583, 587 (8th Cir. 1998). If, after review, it is possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's

findings, the denial of benefits must be upheld.  See Robinson v. Sullivan, 956 F.2d 836, 838 (8th Cir. 1992).   The reviewing court, however, must consider both evidence that supports and evidence that detracts from the Commissioner's decision.  See Johnson v. Chater, 87 F.3d 1015, 1017 (8th Cir. 1996) (citing Woolf v. Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993)).  "[T]he court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contrary."  Burress v. Apfel, 141 F.3d 875, 878 (8th Cir. 1998).  The analysis required has been described as a "searching inquiry."  Id.

**B.**     **The Determination of Disability**

The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 416 (I) (1) (a); 42 U.S.C. § 423 (d) (1) (a).  The claimant has the burden of proving that s/he has a disabling impairment.  See Ingram v. Chater, 107 F.3d 598, 601 (8th Cir. 1997).

The SSA Commissioner has established a five-step process for determining whether a person is disabled.  See 20 C.F.R. §§ 404.1520, 416.920; Bowen v. Yuckert, 482 U.S. 137, 141-42, 107 S. Ct. 2287, 2291, 96 L. Ed. 2d. 119 (1987); Fines v. Apfel, 149 F.3d 893, 894-895 (8th Cir. 1998).  First, it is determined whether the claimant is currently engaged in "substantial gainful employment."  If the claimant is, disability benefits must be denied.  See 20 C.F.R. §§ 404.1520, 416.920 (b).  Step two requires a determination of whether the claimant suffers from a medically severe impairment or combination of impairments.  See 20 C.F.R §§ 404.1520 (c)), 416.920 (c)).  To qualify as severe, the impairment must significantly limit the claimant's mental or physical

ability to do "basic work activities." Id. Age, education and work experience of a claimant are not considered in making the "severity" determination. See id.

If the impairment is severe, the next issue is whether the impairment is equivalent to one of the listed impairments that the Commissioner accepts as sufficiently severe to preclude substantial gainful employment. See 20 C.F.R. §§ 404.1520 (d), 416.920 (d). This listing is found in Appendix One to 20 C.F.R. 404. 20 C.F.R. pt. 404, subpt. P, App. 1. If the impairment meets or equals one of the listed impairments, the claimant is conclusively presumed to be impaired. See 20 C.F.R. §§ 404.1520 (d), 416.920 (d). If it does not, however, the evaluation proceeds to the next step which inquires into whether the impairment prevents the claimant from performing his or her past work. See 20 C.F.R. § 404.1520 (e), 416.920 (e). If the claimant is able to perform the previous work, in consideration of the claimant's residual functional capacity (RFC) and the physical and mental demands of the past work, the claimant is not disabled. See id. If the claimant cannot perform his or her previous work, the final step involves a determination of whether the claimant is able to perform other work in the national economy taking into consideration the claimant's residual functional capacity, age, education and work experience. See 20 C.F.R. §§ 404.1520 (f), 416.920 (f). The claimant is entitled to disability benefits only if s/he is not able to perform any other work. See id. Throughout this process, the burden remains upon the claimant until s/he adequately demonstrates an inability to perform previous work, at which time the burden shifts to the Commissioner to demonstrate the claimant's ability to perform other work. See Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998).

The Commissioner has supplemented this five-step process for the evaluation of claimants with mental impairments. See 20 C.F.R. §§ 404.1520a (a), 416.920a (a). A special procedure

must be followed at each level of administrative review. See id. Previously, a standard document entitled "Psychiatric Review Technique Form" (PRTF), which documented application of this special procedure, had to be completed at each level and a copy had to be attached to the ALJ's decision, although this is no longer required. See 20 C.F.R. §§ 404.1520a (d), (d) (2), (e), 416.920a (d), (d) (2), (e). Application of the special procedures required is now documented in the decision of the ALJ or Appeals Council. See 20 C.F.R. §§ 404.1520a (e), 416.920a (e).

The evaluation process for mental impairments is set forth in 20 C.F.R. §§ 404.1520a, 416.920a. The first step requires the Commissioner to "record the pertinent signs, symptoms, findings, functional limitations, and effects of treatment" in the case record to assist in the determination of whether a mental impairment exists. See 20 C.F.R. §§ 404.1520a (b) (1), 416.920a (b) (1). If it is determined that a mental impairment exists, the Commissioner must indicate whether medical findings "especially relevant to the ability to work are present or absent." 20 C.F.R. §§ 404.1520a (b) (2), 416.920a (b) (2). The Commissioner must then rate the degree of functional loss resulting from the impairments in four areas deemed essential to work: activities of daily living, social functioning, concentration, and persistence or pace. See 20 C.F.R. §§ 404.1520a (b) (3), 416.920a (b) (3). Functional loss is rated on a scale that ranges from no limitation to a level of severity which is incompatible with the ability to perform work-related activities. See id. Next, the Commissioner must determine the severity of the impairment based on those ratings. See 20 C.F.R. §§ 404.1520a (c), 416.920a (c).

If the impairment is severe, the Commissioner must determine if it meets or equals a listed mental disorder. See 20 C.F.R. §§ 404.1520a(c)(2), 416.920a(c)(2). This is completed by comparing the presence of medical findings and the rating of functional loss against the paragraph

A and B criteria of the Listing of the appropriate mental disorders.  See id.  If there is a severe

impairment but the impairment does not meet or equal the listings, then the Commissioner must

prepare a residual functional capacity assessment.  See 20 C.F.R. §§ 404.1520a (c)(3), 416.920a

(c)(3).

**C.    Plaintiff's Claims**

Plaintiff first argues that the ALJ erred in determining that plaintiff did not suffer from an

impairment which meets or equals a listing.  Plaintiff next argues that the ALJ erred in

determining plaintiff's residual functional capacity.  Plaintiff finally argues that the ALJ erred in

failing to obtain testimony from a vocational expert.  The undersigned will discuss plaintiff's

claims in turn.


**1.    Listings**

Plaintiff argues that the ALJ erroneously found that plaintiff did not suffer from an

impairment which meets or equals a listing.  Plaintiff contends that the evidence demonstrates that

plaintiff suffers from an impairment that meets Listing 12.05C and 12.05D.

Listing 12.05 provides as follows:

> 12.05 *Mental Retardation*: Mental retardation refers to significantly subaverage
> general intellectual functioning with deficits in adaptive functioning initially manifested
> during the developmental period; i.e., the evidence demonstrates or supports onset of the
> impairment before age 22.
> The required level of severity for this disorder is met when the requirements in A,
> B, C, or D are satisfied.
>      ***
>      C.  A valid verbal, performance, or full scale IQ of 60 through 70 and a physical
> or other mental impairment imposing an additional and significant work-related
> limitation of function;
>      OR
>      D.  A valid verbal, performance, or full scale IQ of 60 through 70, resulting in at

least two of the following:
    1. Marked restriction of activities of daily living; or
    2. Marked difficulties in maintaining social functioning; or
    3. Marked difficulties in maintaining concentration, persistence, or pace; or
    4. Repeated episodes of decompensation, each of extended duration.

20 C.F.R. pt. 404, subpt. P, App. 1 at 508 (emphasis in original).

The ALJ did not specifically address Listing 12.05. Rather, the ALJ only discussed Listings 12.04, 12.06, and 12.08, and found that plaintiff did not have an impairment that met or medically equaled any of the listed impairments. (Tr. 15).

Defendant contends that plaintiff's impairment does not meet the requirements of Listing 12.05 under C or D because plaintiff is unable to demonstrate the first criteria of the listing: "significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22."

Plaintiff underwent IQ testing in March of 1981, at the age of fourteen, which revealed a verbal IQ of 73, a performance IQ of 67 and a full scale IQ of 68 +/- 3. (Tr. 120). The examiner indicated that plaintiff's results placed her in the mentally deficient range. (Tr. 121). The examiner stated that the results appeared to be valid and recommended that plaintiff remain in special classes. (Id.). School records indicate that plaintiff was working at the fourth to fifth grade levels overall at the age of sixteen. (Tr. 123).

Although the evidence reveals that plaintiff suffered from subaverage general intellectual functioning before age 22, there is insufficient evidence of deficits in adaptive functioning. There is no diagnosis of mental retardation noted in plaintiff's school records. In elementary school, plaintiff received mostly "B" and "C" grades, with some "A" and "D" grades, but no "F"'s. (Tr.

118). In the two years of high school plaintiff attended, she received mostly "P"s, which denotes "passing." (Tr. 115). Plaintiff also received one "A," one "B," three "C"s, and four "F"s. (Id.). It is notable that the Fs plaintiffs received were not in core subjects but were in Typing, Physical Education, and Choir. (Id.). Plaintiff received passing grades in the subjects of Reading, Math, Language, Science, and American History. (Id.). There are no reports other than the IQ testing report, no notes from plaintiff's teachers, and no disciplinary records. Similarly, there is no evidence of deficits in adaptive functioning in the record from the time plaintiff left school to the age of 22. As such, the undersigned finds that there is insufficient evidence in the record of deficits in adaptive functioning manifested prior to age 22. Thus, the ALJ did not err in finding that plaintiff did not suffer from an impairment which meets or equals a listing.

Accordingly, the undersigned recommends that the decision of the Commissioner denying plaintiff's benefits be affirmed as to this point.

## 2. Residual Functional Capacity

Plaintiff next argues that the ALJ erred in formulating her residual functional capacity. Specifically, plaintiff contends that the ALJ failed to consider plaintiff's substantial non-exertional limitations and failed to properly consider the opinion of plaintiff's treating physician.

The ALJ made the following determination regarding plaintiff's residual functional capacity:

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work except understanding, remembering, and carrying out complex or detailed instructions or to make work-related decisions involving similar skilled or semi-skilled task.

(Tr. 17).

Determination of residual functional capacity is a medical question and at least "some

medical evidence 'must support the determination of the claimant's [residual functional capacity] and the ALJ should obtain medical evidence that addresses the claimant's ability to function in the workplace.'" Hutsell v. Massanari, 259 F.3d 707, 712 (8th Cir. 2001) (quoting Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001)). Further, determination of residual functional capacity is "based on all the evidence in the record, including 'the medical records, observations of treating physicians and others, and an individual's own description of his limitations.'" Krogmeier v. Barnhart, 294 F.3d 1019, 1024 (8th Cir. 2002) (quoting McKinney v. Apfel, 228 F.3d 860, 863 (8th Cir. 2000)). Similarly, in making a finding of residual functional capacity, an ALJ may consider non-medical evidence, although the residual functional capacity finding must be supported by *some* medical evidence. See Lauer, 245 F.3d at 704.

Plaintiff contends that the ALJ failed to consider the opinion of plaintiff's treating physician, Dr. Mirza, in formulating plaintiff's residual functional capacity. In analyzing medical evidence, "[i]t is the ALJ's function to resolve conflicts among 'the various treating and examining physicians.'" Johnson v. Apfel, 240 F.3d 1145, 1148 (8th Cir. 2001) (quoting Bentley v. Shalala, 52 F.3d 784, 787 (8th Cir. 1995)). "Ordinarily, a treating physician's opinion should be given substantial weight." Rhodes v. Apfel, 40 F. Supp.2d 1108, 1119 (E.D. Mo. 1999) (quoting Metz v. Shalala, 49 F.3d 374, 377 (8th Cir. 1995)). A treating physician's opinion will typically be given controlling weight when the opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] record." Prosch v. Apfel, 201 F.3d 1010, 1012-1013 (8th Cir. 2000) (quoting 20 C.F.R. § 404.1527 (d)(2) (bracketed material in original). Such opinions, however, do "not automatically control, since the record must be evaluated as a whole." Id. at 1013 (quoting

Bentley, 52 F.3d at 785-786).  Opinions of treating physicians may be discounted or disregarded where other "medical assessments 'are supported by better or more thorough medical evidence.'"  Id. (quoting Rogers v. Chater, 118 F.3d 600, 602 (8th Cir. 1997)).  An ALJ is free to reject the conclusions of any medical source if those findings are inconsistent with the record as a whole.  See Johnson, 240 F.3d at 1148.

Dr. Mirza completed a Medical Source Statement on April 2, 2007.  (Tr. 394-98).  Dr. Mirza listed plaintiff's diagnoses as bipolar affective disorder, PTSD, panic disorder, and borderline personality disorder, with a GAF of 50.  (Tr. 394).  Dr. Mirza stated that plaintiff's impairments would cause her to be absent from work an average of more than three times a month.  (Tr. 396).  Dr. Mirza found that plaintiff had mild limitations in her ability to maintain her personal appearance, relate predictably in social situations, and demonstrate reliability.  (Tr. 397).  Dr. Mirza expressed the opinion that plaintiff had serious limitations in her ability to follow work rules; relate to co-workers; use judgment; interact with supervisors; deal with work stressors; understand, remember, and carry out complex job instructions; understand, remember, and carry out detailed, but not complex, job instructions; understand, remember, and carry out simple job instructions; and behave in an emotionally stable manner.  (Tr. 396-97).  Dr. Mirza found that plaintiff was unable to perform the following skills at all on a sustained basis: deal with the public, function independently, and maintain attention/concentration.  (Id.).  Dr. Mirza expressed the opinion that plaintiff had moderate limitations in her activities of daily living; and marked limitations in her ability to maintain social functioning; deficiencies of concentration, persistence or pace resulting in failure to complete tasks in a timely manner; and episodes of deterioration or decompensation in a work setting.  (Tr. 398).

The ALJ indicated that he was giving the opinion of Dr. Mirza "little weight," because the record indicates that plaintiff was deceptive to him at their first appointment. (Tr. 21). Specifically, the ALJ noted that plaintiff reported that she had not used marijuana, cocaine, or amphetamines for over six years, yet she tested positive for marijuana the same day. (Tr. 21, 312).

The undersigned finds that the ALJ erred in assigning little weight to the opinion of Dr. Mirza. Plaintiff first saw Dr. Mirza on October 13, 2006, for a psychiatric evaluation, at which time Dr. Mirza diagnosed plaintiff with bipolar disorder II, PTSD, panic disorder, rule out OCD, and rule out borderline personality disorder, with a GAF of 50. (Tr. 310). As the ALJ pointed out, although plaintiff claimed that she had not used drugs for six years, plaintiff tested positive for marijuana that day. (Tr. 308, 312). Plaintiff, however, continued to see Dr. Mirza for psychotherapy and medication management one to two times a month through the date of the hearing. Although the validity of Dr. Mirza's findings from plaintiff's initial visit may be questionable due to plaintiff's dishonesty about her drug usage, Dr. Mirza was aware that plaintiff had lied about her drug use at the time he completed his Medical Source Statement in April 2007. His opinion was obviously based on his treatment of plaintiff from October 2006 through April 2007, rather than the initial visit alone. There is no evidence that plaintiff's drug use impacted Dr. Mirza's findings set out in his Medical Source Statement. As such, it was error for the ALJ to reject all of Dr. Mirza's findings due to plaintiff's dishonesty about her drug usage at her initial visit.

Dr. Mirza's opinion regarding plaintiff's functional restrictions is supported by Dr. Mirza's own records. Dr. Mirza consistently noted plaintiff's depression, panic attack symptoms, anxiety,

sleep problems, occasional suicidal thoughts, and flashbacks. (Tr. 303, 298, 295, 288, 284, 374). Dr. Mirza prescribed several psychotropic medications for plaintiff's mental impairments. (Id.). Dr. Mirza is plaintiff's treating psychiatrist and is a specialist in the area upon which he rendered an opinion. (Id.). Further, Dr. Mirza's opinion is consistent with the opinion and records of plaintiff's therapist, Ms. Wiggs. As such, the opinion of Dr. Mirza, as plaintiff's treating psychiatrist, is entitled to controlling weight. The ALJ thus erred in discrediting Dr. Mirza's statements regarding plaintiff's mental limitations.

The ALJ's assessment of plaintiff's mental residual functional capacity is not supported by substantial evidence. In addition to discrediting the opinion of Dr. Mirza, the ALJ assigned "no weight" to the opinions of Ms. Wiggs, and consulting psychologist Dr. Wood. The ALJ, however, indicated that she was giving "great weight" to the opinion of non-examining consulting psychologist Dr. Toll. (Tr. 20). On April 12, 2006, Dr. Toll completed a Psychiatric Review Technique, in which she expressed the opinion that plaintiff had no medically determinable impairment. (Tr. 235-48). "The opinion of a consulting physician who examines claimant once or not at all does not generally constitute substantial evidence." Singh v. Apfel, 222 F.3d 448, 452 (8th Cir. 2000) (quoting Kelley, 133 F.3d at 589). The ALJ erred in giving great weight to the opinion of Dr. Toll, as she had not examined plaintiff, and she did not have the opportunity to review subsequently submitted evidence, including the opinions of Dr. Mirza and Ms. Wiggs, and the records from plaintiff's psychiatric hospitalization following a suicide attempt.

The opinion provided by Dr. Mirza regarding plaintiff's work-related limitations was extremely restrictive. However, as previously discussed, the ALJ improperly discredited the opinion of Dr. Mirza. Moreover, the ALJ does not discuss or otherwise point to any other

medical evidence which supports her conclusions as to plaintiff's residual functional capacity. Aside from the opinion of the non-examining state agency psychologist, the assessments of Drs. Mirza and Wood and Ms. Wiggs are the only evidence in the record regarding plaintiff's functional limitations. Although the ALJ mentioned the opinion of Dr. Wilkaitis, who examined plaintiff during her hospitalization, Dr. Wilkaitis saw plaintiff on one occasion and did not express an opinion regarding her work-related limitations. Thus, the ALJ assessed a residual functional capacity that is not consistent with the medical opinion of any of the treating physicians in the record.

An ALJ "has the 'duty to develop the record fully and fairly, even if ... the claimant is represented by counsel.'" Boyd v. Sullivan, 960 F.2d 733, 736 (8th Cir. 1992) (quoting Warner v. Heckler, 722 F.2d 428, 431 (8th Cir. 1983)). This inquiry, however, is limited to whether the claimant was prejudiced or unfairly treated by the ALJ's development of the record. See Onstad v. Shalala, 999 F.2d 1232, 1234 (8th Cir. 1993). In this case, by discounting the opinions of Drs. Mirza and Wood and Ms. Wiggs, no substantial medical evidence remains in the record which addresses plaintiff's ability to function in the workplace. Without such medical evidence addressing plaintiff's ability to function in the workplace, the ALJ cannot make an informed decision about plaintiff's functional restrictions. As explained above, due to this omission, the ALJ has assessed a mental residual functional capacity which is not based on substantial medical evidence in the record. The undersigned therefore finds that plaintiff has been prejudiced by the ALJ's failure to obtain further medical evidence addressing plaintiff's functional restrictions.

Accordingly, the undersigned recommends that this matter be reversed and remanded to the ALJ in order for the ALJ to accord the proper weight to the medical source statement of Dr.

Mirza, formulate a new mental residual functional capacity for plaintiff based on the medical evidence in the record, and to order, if needed, additional medical information addressing plaintiff's mental ability to function in the workplace.

### 3. Vocational Expert Testimony

Plaintiff finally argues that the ALJ erred by using the Medical-Vocational Guidelines instead of obtaining vocational expert testimony because the ALJ failed to properly consider plaintiff's numerous non-exertional impairments. Plaintiff contends that the ALJ's use of the Medical-Vocational Guidelines, commonly known as the "Grids," to determine that plaintiff was capable of performing other work, was error.

As set forth above, once a claimant establishes that he or she is unable to return to past relevant work, the final step in the sequential process requires a determination of whether a claimant can perform other work in the national economy. The Commissioner may rely on the Medical-Vocational Guidelines to show the availability of work in certain limited circumstances. See Gray v. Apfel, 192 F.3d 799, 802 (8th Cir. 1999). "If an applicant's impairments are exertional, (affecting the ability to perform physical labor), the Commissioner may carry this burden by referring to the medical-vocational guidelines or 'Grids,' which are fact-based generalization[s] about the availability of jobs for people of varying ages, educational backgrounds, and previous work experience, with differing degrees of exertional impairment." Id. (quotation omitted). Use of the guidelines is permissible only if the claimant's characteristics identically match those contained in grids and only if the claimant does not have non-exertional impairments. See Foreman v. Callahan, 122 F.3d 24, 25 (8th Cir. 1997).

As explained by the Eighth Circuit, "[t]he grids [] do not accurately reflect the availability

of jobs to people whose impairments are nonexertional, and who therefore cannot perform the full range of work contemplated within each table." Id. at 26. Accordingly, the Eighth Circuit requires "the Commissioner [to] meet his burden of proving that jobs are available for a significantly nonexertionally impaired applicant by adducing the testimony of a vocational expert." Id. "[W]here a claimant suffers from a nonexertional impairment which substantially limits his ability to perform gainful activity, the grid cannot take the place of expert vocational testimony." Id. (alteration in original) (quoting Talbott v. Bowen, 821 F.2d 511, 515 (8th Cir. 1987)). "Thus, if a claimant's ability to perform the full range of work in a particular category is limited by a non-exertional impairment, the ALJ cannot rely exclusively on the grids to determine disability but must consider vocational expert testimony." Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998).

The undersigned finds that the ALJ committed error by not eliciting the testimony of a vocational expert. The ALJ acknowledged that plaintiff suffers from bipolar affective disorder, posttraumatic stress disorder, panic disorder, and borderline personality disorder, which are non-exertional impairments. (Tr. 14). In addition, the ALJ found that plaintiff suffers from degenerative disc disease of the lumbar spine and degenerative joint disease. (Id.). Plaintiff experiences significant pain due to these impairments. Pain has been found to be a non-exertional impairment. See Gray, 192 F.3d at 802. Further, as discussed above, plaintiff's IQ scores reveal plaintiff suffers from low intellectual functioning. "[B]orderline intellectual functioning, if supported by the record as it is here, is a significant nonexertional impairment that must be considered by a vocational expert." Lucy v. Chater, 113 F.3d 905, 908 (8th Cir. 1997). The ALJ's finding that plaintiff was able to perform other work existing in significant numbers in the

national economy in spite of her non-exertional impairments thus "invaded the province of the vocational expert" and was improper. <u>Foreman</u>, 122 F.3d at 26 (quoting <u>Sanders v. Sullivan</u>, 983 F.2d 822, 824 (8th Cir. 1992)).

As discussed above, the ALJ formulated a residual functional capacity that was not supported by substantial evidence. Based on this erroneous residual functional capacity, she then applied the Medical-Vocational Guidelines and determined that plaintiff could perform other work existing in significant numbers in the national economy. As a result, the undersigned recommends that the decision of the Commissioner be reversed and this matter be remanded to the ALJ in order for the ALJ to reassess plaintiff's residual functional capacity and to adduce the testimony of a vocational expert to determine how plaintiff's non-exertional impairments restrict her ability to perform jobs in the national economy.

# RECOMMENDATION

**IT IS HEREBY RECOMMENDED** that pursuant to sentence four of 42 U.S.C. § 405 (g), the decision of the Commissioner be **reversed** and this case be **remanded** to the Commissioner for further proceedings consistent with this Report and Recommendation.

The parties are advised that they have eleven (11) days in which to file written objections to this Report and Recommendation pursuant to 28 U.S.C. § 636 (b) (1), unless an extension of time for good cause is obtained, and that failure to file timely objections may result in a waiver of the right to appeal questions of fact.  See Thompson v. Nix, 897 F.2d 356 (8th Cir. 1990).

Dated this  11th  day of August, 2009.

LEWIS M. BLANTON
UNITED STATES MAGISTRATE JUDGE